# United States Court of Appeals
# for the Sixth Circuit
## CASE NO. 23-3180

**GARY MCNEAL**

*Plaintiffs/Appellants*

v.

**CITY OF BLUE ASH**, **DAVID WALTZ AND SCOTT NOEL**

*Defendants/Appellees*

:

---

On Appeal from the U.S. District Court, Southern District of Ohio, 1:19-cv-01072

---

## PLAINTIFF'S/APPELLANT'S BRIEF

---

Zachary Gottesman
Gottesman & Associates
404 E. 12th Street, First Floor
Cincinnati, OH 45202
Tel:   513/651-2121

Christopher Wiest (OH 77931)
Chris Wiest, Atty at Law, PLLC
25 Town Center Blvd, Suite 104
Crestview Hills, KY 41017
Tel:   513/257-1895
chris@cwiestlaw.com
*Counsel for Plaintiffs/Appellants*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to FRAP 26.1, Plaintiff/Appellant ("Plaintiff") is not a subsidiary or affiliate of a publicly owned corporation.  There is no publicly owned corporation, not a party to the appeal, which has a financial interest in the outcome.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ...................................................... i

TABLE OF CONTENTS........................................................................... ii

TABLE OF AUTHORITIES ............................................................... iii

STATEMENT CONCERNING ORAL ARGUMENT ......................................... vi

JURISDICTIONAL STATEMENT ..................................................... 1

STATEMENT OF THE ISSUES ......................................................... 1

INTRODUCTION ........................................................................... 1

STATEMENT OF THE CASE AND FACTS....................................................... 2

SUMMARY OF THE ARGUMENT .................................................... 27

STANDARD OF REVIEW ............................................................... 27

ARGUMENT ................................................................................ 28

   I.   Plaintiff adduced enough proof to survive summary judgment on his age discrimination claim ........................................................................... 28

   II.  Plaintiff adduced enough proof to survive summary judgment on his hostile work environment age discrimination claim ..................................... 36

   III. Plaintiff adduced enough proof to survive summary judgment on his state law discrimination claim................................................................... 41

CONCLUSION ............................................................................... 43

APPENDIX -- DESIGNATION OF THE DISTRICT COURT RECORD.............. i

# TABLE OF AUTHORITIES

## Cases

*Abeita v. Transam. Mailings, Inc.*, 159 F.3d 246, 250-252 (6th Cir. 1998)………40

*Argyriou v. David A. Flynn, Inc.*, 2021 U.S. Dist. LEXIS 36454 (N.D. Ohio Feb. 26, 2021)…………………………………………………………………………..43

*Becton v. Detroit Terminal of Consol. Freightways*, 687 F.2d 140, 142 (6th Cir. 1982)…………………………………………………………………………37

*Bowman v. Shawnee State Univ.*, 220 F.3d 456, 463 (6th Cir. 2000)…………….39

*Chattman v. Toho Tenax Am., Inc.,* 686 F.3d 339, 349 (6th Cir. 2012)………33, 34

*Clark Cty. School Dist. v. Breeden*, 532 U.S. 268, 270 (2001)…………………...39

*Crawford v. Medina Gen. Hosp.*, 96 F.3d 830, 834–35 (6th Cir. 1996)………….38

*Crawford v. Newport News Indus*. Corp., 2018 WL 4561671, *13 (E.D. Va.)…..40

*Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 357 (6th Cir. 1998)…………………………………………………………………...28, 42

*Faragher v. City of Boca Raton*, 524 U.S. 775, 787-88 (1998)…………………..39

*Flones v. Beaumont Health System*, 567 Fed.Appx. 399, 406 (6th Cir.2014)……35

*Geiger v. Tower Auto*, 579 F.3d 614, 620 (6th Cir. 2009)……………………29, 33

*Grace v. USCAR*, 521 F.3d 655, 679 (6th Cir.2008)……………………………..39

*Hance v. Norfolk S. Ry.*, 571 F.3d 511, 519 (6th Cir.2009)………………………37

*Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 23 (1993)…………………………..39

*Hauser v. City of Dayton Police Dep't*, 140 Ohio St. 3d 268, 271-272 (Ohio 2014)……………………………………………………………………….29

*Hensley v. Twp.*, 2022 U.S. Dist. LEXIS 180370 (S.D. Ohio 2022)……………43

*House v. Rexam Beverage Can Co.*, 630 F. App'x 461, 463 (6th Cir. 2015)……..29

*Jackson v. Fedex Corp. Servs., Inc.*, 518 F.3d 388, 396 (6th Cir. 2008)…………32

Johnson-Newberry v. Cuyahoga Cty., 2019-Ohio-3655 (8th Dist. 2019)………..43

*Joostberns v. United Parcel Servs., Inc.*, 166 F.Appx. 783, 791
(6th Cir. 2006)………………………………………………………………………35

*Laws v. HealthSouth N. Ky. Rehab. Hosp. Ltd. P'ship*, 508 F. App'x 404,
410-11 (6th Cir. 2012)……………………………………………………………..29

*Levitin v. Northwest Community Hosp*., 64 F.Supp.3d 1107, 1125,
(N.D. Ill. 2014)……………………………………………………………………40

*Linkletter v. W. & S. Fin. Grp., Inc.*, 851 F.3d 632 (6th Cir. 2017)………………43

*Manzer v. Diamond Shamrock Chemicals Co.*, 29 F.3d 1078, 1084
(6th Cir.1994)……………………………………………………………………33, 34

*Martin v. Toledo Cardiology Consultants, Inc.*, 548 F.3d 405 (6th Cir. 2008)……32

*Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 66-67, 106 S.Ct. 2399,
91 L.Ed.2d 49 (1986)…………………………………………………………...38

*Mitchell v. Vanderbilt Univ.*, 389 F.3d 177, 181 (6th Cir. 2004)………....…….31

*O'Donnell v. Univ. Hosps. Cleveland Med. Ctr.*, 833 Fed. Appx. 605
(6th Cir. 2020)……………………………………………………………………..42

*Paasewe v. Action Group, Inc.,* 530 Fed. Appx. 412, 416 (6th Cir. 2013)……….40

*Policastro v. Nw. Airlines, Inc.*, 297 F.3d 535, 538-39 (6th Cir. 2002)…………..30

*Seeger v. Cincinnati Bell Tel. Co., LLC,* 681 F.3d 274, 285 (6th Cir. 2012)…35, 36

iv

*Skalka v. Fernald Envtl. Restoration Mgmt. Corp.*, 178 F.3d 414, 421
(6th Cir. 1999)……………………………………………………………….31

*Snyder v. Pierre's French Ice Cream Co.*, 589 Fed. Appx. 767
(6th Cir. 2014)……………………………………………………………….38

*Speed Way Transp., LLC v. City of Gahanna*, 2023 U.S. App. LEXIS 5135
(6th Cir. 2023)……………………………………………………………..32

*Taglione v. Charter Communs., LLC*, 842 Fed. Appx. 988 (6th Cir. 2021)……….42

*Townsend v. City of Kettering*, 2022-Ohio-2710 (2nd Dist. 2022)………………43

*Warf v. U.S. Dept. of Veterans Affairs*, 713 F.3d 874, 878 (6th Cir. 2013)………39

*White v. Burlington Northern & Santa Fe Ry.*, 364 F.3d 789, 803-804
(6th Cir. 2004)………………………………………………………………40

*Williams v. Mehra*, 186 F.3d 685, 689 (6th Cir. 1999)…………………………...28

**Statutes**

42 U.S.C. § 2000e-2(a)(1)…………………………………………………...38

42 U.S.C. §2000e-5……………………………………………………………...1

28 U.S.C. §1291……………………………………………………………………1

R.C. 2744.03(A)(6)……………………………………………………………43

R.C. 4112.02(N)………………………………………………………………..42

R.C. 4112.14………………………………………………………………..28, 42

R.C. 4112.02(J)…………………………………………………………….29, 43

29 U.S.C. § 623(a)………………………………………………………….29, 38

**Other Authorities**

FED. R. CIV. P. 56(c)..............................................................................................28

## STATEMENT CONCERNING ORAL ARGUMENT

This case raises issues of summary judgment; we request oral argument

because exposition of the facts and application of the law are warranted.

## JURISDICTIONAL STATEMENT

The District Court had federal question jurisdiction over Plaintiff/Appellant's ("Plaintiff") federal claims under 42 U.S.C. §2000e-5. On February 23, 2023 the District Court granted Defendants' Motion for Summary Judgment. [Opinion, DE#63, PageID#3895]. A timely notice of appeal was filed on March 2, 2023. [Notice of Appeal, DE#65, PageID#3897]. Accordingly, this Court has jurisdiction over Plaintiffs' appeal under 28 U.S.C. §1291.

## STATEMENT OF THE ISSUES

This appeal presents the following questions:

(1)    Did the District Court properly grant summary judgment to the Defendants?

## INTRODUCTION

This case involves the termination of Plaintiff Gary McNeal's employment by the City of Blue Ash. The decision makers were the named individual Defendants, City Manager David Waltz and Police Chief Scott Noel. Generally, the evidence established that Officer McNeal was targeted for discipline because he was older, that others similarly situated were not similarly treated, and that these actions ultimately led to the firing of Officer McNeal for reasons that were plainly pretextual.

1

## STATEMENT OF THE CASE AND FACTS

We recount the evidence in the light most favorable to Officer McNeal.

Officer McNeal was previously employed as a police officer with the City of Blue Ash Police Department. (Depo. McNeal, Doc. 27 at p.12, PageID#605.) His date of birth is December 12, 1956. *Id.* At the time of the incidents that led to his termination, he was enrolled in DROP (which is a deferred retirement plan for police officers in the State of Ohio). *Id.* at 12-13, PageID#605-606. And he was scheduled to retire on February 1, 2021. *Id.* Prior to his termination, he was a 17-year veteran with the City of Blue Ash Police Department. *Id.* at p.15, PageID#608. And, in fact, he had more than 33 years of law enforcement experience. *Id.* at pp. 43-47, PageID#636-640.

Prior to 2016, McNeal had an exemplary record with the department. (Zeigler Depo., Doc. 32, p. 163, PageID#1951.) Both current and retired seasoned patrol officers—McNeal's colleagues—described his service as an officer in positive, highly favorable terms, including:

- a superb officer, who did as he was told;

- "courageous, loyal… good to people;"

- having  "great attitude;"

- an officer who "showed up for work early every day"… "with a smile on his face;"

- generally liked by everyone;

- a "heck of an officer;"

- mature and "outstanding at handling situations in the field;"

- one who exceeded the standards of Blue Ash patrol officers in the performance of his duties.

(Charron Depo. Vol. I, Doc. 35, p. 33, pps. 193-194, 288 PageID#2082, 2242-2243; Charron Depo. Vol. II., Doc. 36, p. 288, PageID#2360; Ziegler Depo., Doc. 32, p. 163, PageID#1951; Stewart Depo., Doc. 51, p. 25, PageID#3321; Schrand Declaration, Doc. 40, ¶12, PageID#2684.)

<u>The alleged infractions</u>:

Despite his almost perfect record, upon Chief Noel's promotion in 2016, McNeal accumulated numerous disciplinary infractions for minor policy violations, which were rarely if ever invoked upon other officers.  In fact, in less than 2 years, Blue Ash disciplined McNeal for numerous minor infractions that many officers described as common place and not otherwise subjected to punishment, including the following:

- **April 21, 2016**  - Blue Ash issued documented counseling for McNeal's failure to ensure that his microphone was turned on during a traffic stop (Doc. 27, McNeal Depo., pps. 64-65, PageID#657-658);

3

- **December 15, 2016** -  Blue Ash issued an oral reprimand to McNeal for failure to comply with training requirements (Doc. 27, McNeal Depo, Ex. G, PageID#1002, 1033);

- **December 27, 2016**- Blue Ash issued a written reprimand to McNeal for failure to complete or supplement two police reports (Doc. 27-7, McNeal Depo., Ex. G, PageID#1002, 1033);

- **January 3, 2017** –Blue Ash issued a suspension without pay to McNeal for responding 30 minutes late to a noise complaint at The Retreat, a neighborhood under construction by Summit Park (Doc. 27-7,McNeal Depo., Ex. G, PageID#1002, 1033);

- **July 24, 2017** – Blue Ash issued a 3-day suspension without pay for McNeal's failure to have the correct "return to work" form after a 6-week medical leave (Doc. 27-7, McNeal Depo., Ex. G, PageID#1002, 1033); and

- **July 24, 2017** - Blue Ash issued a 4-day suspension without pay to McNeal for his failing to submit narrative supplements on a report (Doc. 27-7, McNeal Depo., Ex. G, PageID#1002, 1033.)

All except the first instance were offered as additional justification for his termination in 2018.  (McNeal Depo., Doc. 27-7, Ex. G, PageID#1002, 1033.)

### **Other evidence of pretext**

4

Not only does McNeal offer his own valid justifications for these minor infractions, numerous current and retired Blue Ash police officers testified that the discipline imposed upon McNeal during this last two years was excessive, a clear double standard, and motivated not by actual department concerns but by bias against older officers.   For example, McNeal disputes that documented counseling was necessary for his failure to engage his microphone, as an undocumented verbal warning was both sufficient and consistent with Blue Ash practice. (Doc. 27, McNeal Depo., pps. 69-70, PageID#662-663.) This level of discipline becomes more suspect considering that many officers complained about the antiquated and faulty microphone equipment. (Doc. 39, Zielinski Depo,[1] p. 155, PageID#2563;  Doc. 32, Ziegler Depo., pps. 66, 125 PageID#1854, 1913; Doc. 47, Fritts Depo., pps. 54-55, PageID#3034-3035.)  In fact, many officers struggled with this equipment, some on an almost daily basis.  (Doc. 51, Stewart Depo., p. 58; Doc. 49, PageID#3354, Roach Depo., pps. 67-68, Doc. 54, PageID#3255-3256.)  Given the constant problems with the microphone use, some officers assumed that simply turning them on was sufficient; a separate "workability" check was not required. (Doc. 39, Zielinksi Depo., p. 137, PageID#2545.) In addition, officers also testified to having a certain

---

[1]     Christopher James Zielinski is a retired Blue Ash police officer with 30 years of experience in law enforcement, 19 of them with Blue Ash.  Officer Zielinski worked with McNeal for 16 years.

level of discretion as to whether to turn off the equipment if they considered a recording unnecessary. (Doc. 39, Zielinski Depo., p. 155, PageID#2563.)

Management was well aware of the malfunctioning microphones. (Doc. 32, Ziegler Depo., p. 124, PageID#1912; Doc. 30, Ziegler Declaration, ¶ 12, PageID#1785.) And audits of "microphone" checks, such as Blue Ash applied to McNeal, were "unheard of" to other officers; violations for the microphone policy—which happened in real time as opposed to showing up in an audit of past usage—resulted in informal "Blue Book" discipline.[2] (Doc. 47, Fritts Depo., pps. 55-56, PageID#3035-3036; Doc. 51, Stewart Depo., pps. 55-56, PageID#3351-3352.) Supervisory officers described these types of problems as a training issue rather than a disciplinary problem. (Doc. 51, Stewart Depo., pps. 58-59, PageID#3354-3355.) In fact, Sergeant Stewart, a patrol sergeant, agreed that, particularly in McNeal's case, this would have been an area for targeted training as opposed to discipline, since McNeal was not the type of officer to ignore a requirement. (Doc. 51, Stewart Depo., pps. 59-6060, PageID#3355-3356.)

Blue Ash's oral reprimand to McNeal for failing to complete training certificates was also excessive, as the usual sanction for late training was an informal "Blue Book" or simply no discipline at all. (Doc. 39, Zielinski Depo., p 162,

---

[2] A "Blue Book" discipline is an informal counseling that is not contained in an officer's personnel record.

PageID#2570.) In a similar vein, Blue Ash issued far too harsh a penalty for McNeal's failure to return a medical form after a 6-week medical leave; McNeal and other officers identified situations in which this act was not considered a sanctionable offense; McNeal identified a similar situation happening with Officer Taylor with no resulting discipline. (Doc. 27, McNeal Depo., p. 225, PageID#818; Doc. 47, Fritts Depo., p. 43, PageID#3023; Doc. 39, Zielinski Depo, pps. 171-172, PageID#2579-2580.) Current officers with supervisory responsibilities have denied ever seeing another officer disciplined for this type of offense. (Doc. 51, Stewart Depo., pps. 30-31, PageID#3326-3327.)

Blue Ash twice disciplined McNeal for failing to complete or supplement reports. With respect to the July, 2017, incident, McNeal had just returned from a 6-week medical leave. (Doc. 27, McNeal Depo. p. 92, PageID#685.) Further, it was routine for officers to turn in late reports without discipline, as a number of informational sources could cause delay in completing the information. (Doc. 39, Zielinski Depo, p. 167, PageID#2575.) Several officers testified that other officers, including younger ones, were not similarly disciplined for submitting late reports or failing to properly submit their reports into the software system. (Doc. 39, Zielinski Depo., p. 167, PageID#2575; Doc. 35, Charron Depo. Vol. I, pps. 33, 167, PageID#2082, 2216; Doc. 49, Roach Depo., p. 52-53, PageID#3240-3241; Doc. 33, Charron Declaration, ¶ 17, PageID#2047.) In fact, Sergeant Charron recalled

7

reviewing the system after McNeal had talked to him about the discipline, and seeing the report of a younger officer, Officer Owens, still pending, and which had been pending longer than McNeal's, and had not been addressed. (Doc. 35, Charron Depo. Vol. I, pps. 33, 167, PageID#2082, 2216.)

Officer Roach had never seen such an intense level of discipline for simply turning in a late report. (Doc. 49, Roach Depo., p. 53, PageID#3241), and could only identify a Blue Book discipline for an officer's late narrative report. (Doc. 54, Roach Depo., Volume II, p. 173, PageID#3643.)  Supervisory officers described such discipline as excessive.  (Doc. 51, Stewart Depo., pps. 44-45, PageID#3340-3341.) Current officers have testified that these were minor incidents and should have been handled differently. (Doc. 42, Schrand Depo., p. 139., PageID#2825.)

In other words, the general practice of timely submitting reports was more relaxed than McNeal's reprimand suggests; the timeliness was dependent upon several factors including the information available. (Doc. 47, Fritts Depo., pps. 36-37, PageID#3016-1017.)  Furthermore, the underlying report for the December, 2016 incident was not even McNeal's responsibility to complete, as another officer was tasked with the reporting responsibility. (Doc. 39, Zielinski Depo, p. 166, PageID#2574).  And for all of their concerns about the timely submission of reports, Lt. Gerhardt backdated his quarterly reports to maintain the appearance of timeliness without consequence. (Doc. 47, Fritts Depo., p. 20, PageID#3000.)

With respect to the 30-minute delay in responding to a construction noise complaint at The Retreat, McNeal offered a valid explanation. He initially requested a copy of the relevant ordinance from dispatch to ensure any subsequent enforcement action was appropriate. (Doc. 27, McNeal Depo, p. 232, PageID#825). He then arrived at the wrong construction site, as the location had two open sites in Blue Ash. *Id.* Finally, he made the discretionary decision to aid another officer by supplying him with a microphone while on a traffic call, concluding that the noise compliant was not urgent. *Id.* Blue Ash officers, including those with supervisory responsibilities, have characterized a suspension without pay as unheard of for a simple noise complaint issue. (Doc. 47, Fritts Depo., p. 232, PageID#3020; Doc. 51, Stewart Depo., pps. 33-34, PageID#3329-3330; Doc. 49, Roach Depo., pps. 54-55, PageID#3242-3243.) Further, Officer Schrand explained that this was not even McNeal's normal "beat," so it was understandable that he arrived at the wrong Blue Ash construction site. (Doc. 42, Schrand Depo., p. 128, PageID#2814.) Finally, in stark contrast to this excessive discipline inflicted on McNeal, Lt. Gerhart missed— was not late but absent from-- two details within a few months and self-sanctioned with an "documented counseling" for both infractions. (Doc. 49, Roach Depo., pps. 55-56, PageID#3243-3244.)

When evaluating comparable discipline related to McNeal's failure to turn in medical reports, not only had other officers done the same, Sergeant Charron

testified that Chief Noel expressed excitement and was "giggling" when relaying that McNeal was going to be disciplined for a late medical report. (Doc. 35, Charron Depo. Vol. I, p. 193, PageID#2242.) Current Blue Ash officers, including those with supervisory responsibility, deem this as excessive discipline for the offense. (Doc. 51, Stewart Depo., pps. 38-40, PageID#3334-3336; Doc. 49, Roach Depo., p. 58, PageID#3246.)

### Termination

On June 6, 2018, McNeal was dispatched to a possible overdose at the Frisch's restaurant in Blue Ash. (Doc. 27, McNeal Depo., p 147-149, PageID#740-742.) Sometime after the original dispatch call, the description was changed from a possible overdose to a "non-breather." (Doc. 27, McNeal Depo., p. 149, PageID#742.) An ambulance (life squad) was dispatched to the scene. (Doc. 27, McNeal Depo., p. 151, PageID#744.) In every instance where an ambulance is dispatched in Blue Ash, a police officer is dispatched as well. (Doc. 27, McNeal Depo., p. 151., PageID#744.) McNeal was also aware that CPR was being administered. (Doc. 27, McNeal Depo., p. 154, PageID#747.)

It took McNeal 1 minute and 52 seconds to leave the station and enter his vehicle to respond. (Doc. 27, McNeal Depo., p. 159-160, PageID#752-753.) Officers have testified that this is not a long time, and an officer could face a "catch 22" by abandoning another project early and risking discipline for not properly completing

the task at hand. (Doc. 35, Charron Depo. Vol. I, pps. 122-123, PageID#2171-2172.) While in route, McNeal exercised his discretion not to engage his vehicle lights or sirens. (Doc. 27, McNeal Depo, p. 165-166, PageID#758-759.) He made this decision because he knew CPR was being performed and the life squad was ahead of him. (Doc. 27, McNeal Depo., p. 165, PageID#758.) When a life squad is also dispatched, the Blue Ash police officers have a known practice of staying behind the squad cars to avoid interference in the medical response. (Doc. 27, McNeal Depo., p. 166, PageID#759.)

Current and retired officers, including current officers with supervisory responsibilities, agree that the officer has discretion to engage lights and sirens in these situations and that this discretion could be influenced by the existence of an ambulance or squad run. (Doc. 51, Stewart Depo., pps. 46-47, 49, PageID#3342-3343, 3345; Doc. 49, Roach Depo., pps. 63-64, PageID#3251-3252; Doc. 32, Ziegler Depo., p. 110-111, PageID#1898-1899; Doc. 35, Charron Depo. Vol. I, p. 114, PageID#2163; Doc. 33, Charron Declaration, ¶¶ 3-4, PageID#2045; Doc. 30, Ziegler Declaration, ¶¶ 3-4, PageID#1784.) In fact, staying out of the way of the ambulance is an "unwritten rule" and a general practice of the Blue Ash patrol officers. (Doc. 32, Ziegler Depo., p. 110-111, PageID#1898-1899; Doc. 30, Ziegler Declaration, ¶ 7, PageID#1785; Doc. 37, Zielinski Declaration, ¶ 3, PageID#2406.) Officers have testified that the "main role" of the police officers is to support and/or assist the life

11

squad.   (Schrand Declaration ¶ 2; Doc. 42,   Schrand Depo., pps. 36-37, PageID#2722-2723; Doc. 30, Ziegler Declaration, ¶ 7, PageID#1785.)   In fact, testimony established examples of some officers not only routinely failed to engage their sirens and lights without discipline, but failing to even respond to a squad run without discipline. (Doc. 44, John Connolly Declaration, ¶¶ 4-5, PageID#2975; Doc. 43, Jim Kelley Declaration, ¶ 4, PageID#2973; Doc. 45, Rich Riley Declaration, ¶ 3, PageID#2978.)

Officers have denied any particular policy or rule requiring sirens and lights (Code 3) in every situation; rather this is something within an officer's discretion since the policies and procedures do not address every exact situation. (Doc. 35, Charron Depo. Vol. I, pps. 116-119, PageID#2165-2168.) In fact, there is an incentive not to draw attention away from the squad. (Doc. 42, Schrand Depo., pps. 49-50, PageID#2735-2736.) Further, the squad patrol is in a better position to render lifesaving procedures than police officers, as the officers may not be as up to date and as familiar with practicing CPR and do not possess the same expertise as trained medical personnel.  (Doc. 35, Charron Depo. Vol. I, pps. 129-130, PageID#2178-2179.)  Current officers agree that McNeal was "absolutely" doing his job correctly on this dispatch. (Doc. 42, Schrand Depo., pps. 59-60, PageID#2745-2746.) Sergeant Charron identified an incident in which a younger officer—Officer Huff— failed to respond with lights and sirens due to the presence of other officers at the

scene and was not disciplined. (Doc. 35, Charron Depo. Vol. I, pps. 34; 118-119, PageID#2083, 2167-2168.)

Current officers have denied knowledge of the policy that an officer must inform dispatch of its decision not to engage the lights and sirens. (Doc. 42, Schrand Depo., p. 42, PageID#2728.) In fact, Officer Schrand testified that if this is an existing policy, it must be removed because there are times when officers need to arrive without a warning, such as a gun call. (Doc. 42, Schrand Depo., 43, PageID#2729.) Schrand also testified that he is often proceeded without lights and sirens, at an increased speed and running through traffic lights, and never been disciplined; in fact, according to Schrand, "every officer does this" including the chief, all without being disciplined. (Doc. 42, Schrand Depo., p. 45-46, PageID#2731-2732.)  Further, he has never seen another officer disciplined for going on a squad run without lights and sirens, describing the targeted discipline of McNeal as "hard to take." (Doc. 42, Schrand Depo, p. 52, PageID#2738.)

So even though McNeal was simply operating under the current practices and procedures as identified by numerous officers, as a result of his decision not to engage his lights and siren, the administration performed an internal review, which involved checking his speed during the response call and performing a past audit of his microphone use.  (Doc. 27-7, McNeal Depo., Ex. G, PageID#1000; 1007-10016.) The review was likely triggered by Chief Noel's decision to respond to the dispatch;

13

in fact he beat McNeal to the scene. (Doc. 27-7, McNeal Depo. Ex. G, PageID#1003.) According to current and retired police officers, a chief chasing a patrolman to a squad run is, at least, uncommon and to some, an unheard-of practice. (Doc. 40, Schrand Declaration, ¶ 9, PageID#2684; Doc. 44, Connolly Declaration, ¶ 6, PageID#2975; Doc. 45, Riley Declaration, ¶ 5, PageID#2978.)

Blue Ash ultimately issued the following violations against McNeal for this incident:

- Failing to properly respond to an emergency call in violation of Blue Ash Policy;

- Violating traffic laws while not under lights and siren (code 3) in violation of Blue Ash Policy;

- Failing to be familiar with department policy in violation of Blue Ash policy;

- Failing to properly check and utilize Mobile Audio Video in violation of Blue Ash Policy; and

- Untruthfulness during an investigative interview in violation of Blue Ash Policy.

(Doc. 27-7, McNeal Depo., Ex. G, PageID#1000.) Based on these violations, as well as the past disciplinary violations, Chief Noel recommended termination of McNeal's employment. (Doc. 27, McNeal Depo., Ex. G, PageID#1000.) As a result of this termination, McNeal lost 2 years of the DROP participation. (Doc. 27,

14

McNeal Depo., pps. 14-15, PageID#607-608.)   Further, due to the negative references of his termination, which Chief Noel reported to Hamilton County and made a public record, he has been precluded from alternative police officer work. (Doc. 27, McNeal Depo., 15, PageID#608.)  City Manager Waltz followed Noel's recommendation and terminated McNeal.  *Id.*; Exhibit G.

Current officers, including those with supervisory responsibilities, have described this discipline as too harsh and, coupled with the prior progressive disciplinary infractions, believe that it evidences a targeted approach of higher scrutiny not applied to other officers to terminate McNeal.  (Doc. 51, Stewart Depo., pps. 61-62, PageID#3357-3358; Doc. 49, Roach Depo., p. 69, PageID#3257.) These officers have stated that it is not humanly possible to obey every traffic law while responding to a call.  (Doc. 51, Stewart Depo., pps. 51-53, PageID#3347-3349.)

### Age Based Bias

Blue Ash police officers have testified that older officers nearing retirement are subjected to more intense scrutiny than younger officers. (Doc. 30, Zeigler Declaration, ¶ 13, PageID#1785; Doc. 33, Charron Declaration; ¶ 13, 15, PageID#2046-2047; Doc. 37, Zielinski Declaration, ¶¶ 5, 8, PageID#2406-2407; Doc. 40, Schrand Declaration, ¶¶ 5-6, PageID#2683.) Current and former Blue Ash officers testified that older officers, nearing retirement, without a history of any significant prior discipline, were suddenly targeted for disciplinary issues under the

15

new administration, particularly Chief Noel and Lt. Gerhardt. (Doc. 35, Charron Depo. Vol. I, pps. 32-33, PageID#2081-2082; Doc. 37, Zielinksi Declaration, ¶¶ 8, 11, PageID#2407; Doc. 40, Schrand Declaration, ¶ 8, PageID#2684)  In other words, different officers received different discipline.  (Doc. 51, Stewart Depo., pps. 17-19, PageID#3313-3315.)  And in particular with McNeal, Officers believed he was subjected to a level of scrutiny and excessive discipline that would have been "difficult to survive."  (Doc. 51, Stewart Depo., p. 25-26, PageID#3321-3322) This involved harsh discipline for insignificant policy violations which other, younger officers were not subjected to. (Doc. 51, Stewart Depo. pps. 63-65, 73 PageID#3359-3361, 3369; Doc. 49, Roach Depo., p. 43-44, PageID#3231-3232.) For example, one officer described an instance where another officer, Officer Ballman, drove through a red light at 75 miles per hour, and was not disciplined.  (Doc. 51, Stewart Depo., p. 73, PageID#3369.) This same officer was not disciplined for failing to activate her mobile video on a stop. (Doc. 51, Stewart Depo., p. 75-76, PageID#3371-3371.)

Officers testified that Chief Noel and Lt. Gerhardt deliberately conspired to terminate McNeal and other officers over the age of 40 by perverting existing policy and constantly checking on and scrutinizing their work.  (Doc. 35, Charron Depo. Vol. I, pps. 81, 101, 126-127, PageID#2130, 2150, 2175-2176.)  They believed this occurred because the officers were older.  (Doc. 35, Charron Depo. Vol. I, p. 146, PageID#2195.)

Officer Schrand observed older employees being passed up for promotions while younger, less qualified officers received them; he particularly describes Officer Fritts being passed up for a promotion. (Doc. 42, Schrand Depo., p. 74, PageID#2760.)  He also described an older officer, Jim Kelly, being pulled back to street duty after working as a detective for years and believed this decision was to force him to retire.  (Doc. 42, Schrand Depo., p. 75-78, PageID#2761-2764.) And he observed another older officer, Mike Bray, as being targeted for increased scrutiny and harsh discipline for minor violations such as report issues. (Doc. 42, Schrand Depo., pps. 87-88, PageID#2773-2774.)

## Other testimony

Officer McNeal's testimony was that he was discriminated against by Scott Noel, who engaged in a campaign of write-ups against him starting when Noel was a Sergeant supervising him in 2015.  *Id.* at 63-68, PageID#656-659.  It was when McNeal was written up for a microphone violation, even though the entire department had similar infractions, that prompted a memorandum to be issued to the police force to advise officers to stop violating the policy.  *Id.* at 67, PageID#660. After Noel was promoted to Lieutenant, McNeal was disciplined by his sergeant who reported directly to Noel, for being slow to respond.  *Id.* at 87-89, PageID#680-682.

17

After Noel was promoted to Police Chief in December, 2017, McNeal confronted Noel, and indicated that he did not appreciate being "paper trailed" out of the department and advised that he was being discriminatorily disciplined. *Id.* at 93-95, PageID#686-688. In response, Noel agreed with McNeal. *Id.* But, the pattern of discriminatory treatment continued, and McNeal was later disciplined after being injured, by failing to turn in a doctor's note upon his return to duty, even though others were not disciplined for the same violations. *Id.* at 96-99, PageID#689-692.

McNeal testified he was terminated because there was a pattern of discrimination towards older officers approaching retirement age. *Id.* at 100-104, PageID#693-697. The pretext for that was failing to activate lights and sirens in the run on June 28, 2016 to Frisch's. *Id.* at 21, 125-126, PageID#614, 718-719.

Moreover, with respect to the administration in place since 2016, current and retired officers testified as to a pattern of disparate discipline directed upon older officers, with McNeal subjected to increased scrutiny and harsher discipline, including the following:

- Officer Fritts[3] testified that:

---

[3]    Officer William Fritts has been employed as a Blue Ash police officer for over 18 years.

18

- o McNeal was not treated fairly and was specifically targeted for progressive discipline in an effort to end his employment (Doc. 47, Fritts Depo., pps. 15-16, PageID#2995-2996);

- o Those officers who had less tenure on the police force were not subjected to the same level of targeted discipline; in fact, the administration overlooked the same type of minor policy violations for which McNeal was disciplined when the violations involved younger officers (Doc. 47, Fritts Depo., pps. 18-19, PageID#2998-2999);

- o McNeal's work performance remained consistent and steady prior to his termination, yet he was progressively disciplined under Chief Noel, to the point that Fritts raised this issue with the administration (Doc. 47, Fritts Depo., pps.22-23, PageID#3002-3003);

- o Blue Ash command staff, specifically Chief Noel and Lt. Gerhardt, singled out McNeal for disparate treatment that included heightened scrutiny of his work performance (Doc. 47, Fritts Depo., pps. 63-64, PageID#3043-3044);

- o Blue Ash command staff, specifically Chief Noel and Lt. Gerhardt, singled out McNeal for disparate treatment that included punishment for minor or insignificant policy violations that would pass without

notice, comment or discipline if done by other officers (Doc. 47, Fritts Depo., pps.64, PageID#3044); and

- o   Blue Ash command staff, specifically Chief Noel and Lt. Gerhardt, singled out McNeal for disparate treatment that included harsher punishments than those received, if any, by other officers for similar conduct (Doc. 47, Fritts Depo., p. 64, PageID#3044).

- Officer Roach[4] testified that:

  - o   When Chief Noel assumed his role, McNeal became the subject of heightened scrutiny and targeted discipline with severe consequences (Doc. 49, Roach Depo., pps. 16-18, PageID#3204-3206);

  - o   Blue Ash does not enforce its discipline fairly, with older officers, such as McNeal, receiving more severe discipline for the same offenses (Doc. 49, Roach Depo., pps. 18-20, PageID# 3206-3208);

  - o   Blue Ash, and specifically Chief Noel and Lt. Gerhardt, singled out McNeal for disparate treatment that included heightened scrutiny based on his work performance (Doc. 49, Roach Depo., pps. 46-47, PageID#3234-3235);

---

[4]      Officer Beth Roach is employed as a Blue Ash police officer; she currently serves as the community relations officer and has been employed with Blue Ash for over 21 years.

- o Blue Ash, and specifically Chief Noel and Lt. Gerhardt, singled out McNeal for disparate treatment that included punishment for minor or insignificant policy violations that would pass without notice, comment or discipline if committed by other officers (Doc. 49, Roach Depo., pps. 47-48, PageID#3235-3236); and

- o Blue Ash, and specifically Chief Noel and Lt. Gerhardt, singled out McNeal for disparate treatment that included harsher punishments than those received by other officers for similar infractions (Doc. 49, Roach Depo, p. 48, PageID#3236).

- Sergeant Stewart[5] testified that:

  - o Blue Ash does not administer discipline fairly and evenly within the department (Doc. 51, Stewart Depo., p. 17, PageID#3313);

  - o From 2016-2018, McNeal was subjected to a level of heightened scrutiny not applied to other officers that would have been "difficult to survive" (Doc. 51, Stewart Depo. p. 25, PageID#3321);

  - o Blue Ash command staff, specifically Chief Noel and Lt. Gerhardt, singled out McNeal for disparate treatment that included heightened

---

[5]      Sergeant Todd Stewart has been employed as a Blue Ash Police Officer since 2008; in 2016 he was promoted to patrol sergeant.

scrutiny of his work performance (Doc. 51, Stewart Depo., p. 63, PageID#3359);

o  Blue Ash command staff, specifically Chief Noel and Lt. Gerhardt, singled out McNeal for disparate treatment that included punishment for minor or insignificant policy violations that would pass without notice, comment or discipline if done by other officers (Doc. 51, Stewart Depo., pps. 63-64, PageID#3359-3360); and

o  Blue Ash command staff, specifically Chief Noel and Lt. Gerhardt, singled out McNeal for disparate treatment that included harsher punishments than those received, if any, by other officers for similar conduct (Doc. 51, Stewarts Depo., p. 64, PageID#3360.)

- Officer Schrand[6] testified that:

o  Once he neared retirement, he was subjected to a higher scrutiny of discipline than other non-participating officers (Doc. 42, Schrand Depo., pps. 166-167, PageID#2852-2853);

o  Discrimination occurs within the Blue Ash Police Department and reporting such discrimination would be detrimental to an officer's career (Doc. 42, Schrand Depo., pps. 170-171, PageID#2856-2857);

---

[6]     Officer Kenneth Schrand has been employed as a Blue Ash officer for over 20 years and a participant in the Deferred Retirement Option Plan, or DROP, retirement program.

- o Command staff would find violations and infractions for the purpose of creating a paper trail to discipline another officer rather than improving the efficiency of the department (Doc. 42, Schrand Depo., pps. 177-178, PageID#2863-2864);

- o Chief Noel and Lt. Gerhardt targeted McNeal for disparate treatment including:

  - ■ heightened scrutiny in his work performance;

  - ■ disparate treatment resulting in harsher discipline than other officers, including minor or insignificant policy violations that would have passed without notice, comment, or discipline if committed by other officers;

  - ■ and harsher punishment than other officers would receive for similar offenses (Doc. 42, Schrand Depo., pps. 192-194, PageID#2878-2880);

- o Chief Noel and Lt. Gerhardt targeted McNeal for disparate treatment that included assignments of menial, embarrassing, or degrading tasks (Doc. 42, Schrand Depo., p. 194, PageID#2880);

- o The Administration was targeting McNeal to get rid of him rather than to improve department efficiency (Doc. 42, Schrand Depo., pp. 181, PageID#2867); and

23

- o Lt. Gerhardt carried out Chief Noel's orders to fulfill his personal agenda, such as getting rid of McNeal (Doc. 42, Schrand Depo., pps. 183-184, PageID#2869-2870).

- Retired Sergeant Charron[7] testified that:

  - o Chief Noel and Lt. Gerhardt targeted McNeal for disparate treatment that included heightened scrutiny of his work performance (Doc. 36, Charron Depo. Vol. II, p. 285, PageID#2357);

  - o Chief Noel and Lt. Gerhardt targeted McNeal for disparate treatment that included punishment for minor and insignificant policy violations that would pass without comment or discipline if committed by other officers (Doc. 36, Charron Depo. Vol. II, p. 286, PageID#2358);

  - o Chief Noel and Lt. Gerhardt targeted McNeal for disparate treatment that included harsher punishments than those received, if any, by other officers for similar conduct (Doc. 36, Charron Depo. Vol. II, p. 286, PageID#2358);

  - o Chief Noel and Lt. Gerhardt targeted Gary McNeal for disparate treatment that included assignments of menial, embarrassing, or

---

[7] Edward Lee Lyle Charron is a retired Blue Ash police officer, he served with Blue Ash for 23 years until he took an early retirement. Sergeant Charron was another responding officer to the dispatch call which culminated in McNeal's wrongful termination.

24

degrading tasks (Doc. 36, Charron Depo. Vol. II, p. 287, PageID#2359);

o   This targeting of McNeal by the administration was due to his senior position and age (Doc. 36, Charron Depo. Vol. II, p. 287, PageID#2359);

o   Older officers were targeted for heightened scrutiny as opposed to younger officers (Doc. 33, Charron Declaration; ¶13, PageID#2046.)

Evidence established that the discipline issued to McNeal was disparate and other officers received far less discipline, or no discipline, for similar offenses, and the light/siren issue that Defendants argued was the basis for termination, other officers testified was commonplace and not punished.  (Dec. Officer Jim Kelley, Doc. 43, PageID#2972; Dec. Mark Ziegler, Doc. 30, PageID#1784; Depo. Mark Zeigler, Doc. 32, PageID#1871-1876; Dec. Connolly, Doc. 44, PageID# 1784; Dec. Riley, Doc. 45, PageID# 1784; Dec. Charron, Doc. 33, PageID#2045; Depo. Ziegler, Doc. 32, PageID#1890; Depo. Schrand, Doc. 42, PageID#2729-2733[8]; Depo. Frits, Doc. 47, PageID#3027-3029; Dec. Charron, Doc. 35, PageID#2216; Stewart Depo., Doc. 51, PageID#3421-3425.)  This testimony included specific individuals and

---

[8] Officer Schrand's testimony was that even the Chief has made emergency runs without lights and sirens without consequence.  *Id.*

incidents that were identical, committed by younger officers, yet none of them received discipline. *Id.*

And, again, the discrimination extended beyond the lights and siren call in June, 2018, to other discipline imposed upon Officer McNeal. Officer Stewart testified Officer Ballman is an example of someone who committed similar violations and received only minor discipline. (Stewart Depo., Doc. 51, PageID#3476-3480.) Other officers testified discipline issued to McNeal was harsher than would be given to other officers committing similar offenses. (Roach Depo., Doc. 49, PageID#3238-3250.) McNeal was disciplined when he did not turn in a certificate for training on time. But Officer Stewart testified he is aware when this occurs other officers are just reminded to turn them in. (Stewart Depo., Doc. 51, PageID#3390-3394.)

Evidence also established a pattern of targeting older officers for heightened scrutiny, removing them from their assignments without cause, and passing older officers over for premium positions in favor of younger, less experienced officers, with witnesses testifying to particular persons, examples, and incidents. (Charron Declaration, ¶13, Doc. 33, PageID#2046; John Connolly Declaration, Doc. 44, PageID#2046; Schrand Depo., Doc. 42, PageID#2758, 2763; Charron Depo. Vol. II, Doc. 36, p. 285, PageID#2357; Fritts Depo, Doc. 47, PageID#3005.) Officers Zelinski, Ziegler, Charron, Fritts all stated they observed how McNeal was targeted

for discipline and investigation, and the same scrutiny was not applied to other officers. They testified this is a tactic they have observed with other older officers. (Doc. 47, Fritts Depo, PageID#3045-3046; Doc. 37, Zelinski PageID#2606-2407; Doc. 30, Ziegler, PageID#1785; Doc. 33, Charron, PageID#2046.)

*Perhaps most significantly*, Officers were subjected to retaliation when they participated in the lawsuit below by identifying disparate treatment. Officers were intimidated by the administration for testifying in this case or reporting misconduct, including the Chief of Police materially interfering with the lawsuit by calling a departmental meeting to tell the officers how he expected them to testify in this case. (Schrand Depo., Doc. 42, PageID#2871; Fritts Depo., Doc. 47, PageID#3041-3043; Roach Depo., Doc. 49, PageID#3260-3265; Stewart Depo., Doc. 51, PageID#3260-3265).

## SUMMARY OF THE ARGUMENT

The District Court improperly granted Defendants summary judgment.

## STANDARD OF REVIEW

This Court reviews the district court's denial of summary judgment de novo. *Williams v. Mehra*, 186 F.3d 685, 689 (6th Cir. 1999) (en banc). Summary judgment is warranted where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). In

considering a motion for summary judgment, the Court views the factual evidence and draws all reasonable inferences in favor of the non-moving party. *Williams*, 186 F.3d at 689.

Also, the Court need not analyze separately the state-law claim because "[u]nder Ohio law, the elements and burden of proof in a state age-discrimination claim parallel the ADEA analysis." *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 357 (6th Cir. 1998); *see, also* R.C. 4112.14.  Though one difference is that Ohio law permits individual liability against supervisors and managers who "aid, abet, incite, compel, or coerce" "or to attempt directly or indirectly to commit any" any violations of the Chapter 4112.  R.C. 4112.02(J); *Hauser v. City of Dayton Police Dep't*, 140 Ohio St. 3d 268, 271-272 (Ohio 2014).

## ARGUMENT

### I.    Plaintiff adduced enough proof to survive summary judgment on his age discrimination claim

The ADEA prohibits an employer from "discriminating against an employee over the age of forty because of the employee's age." *House v. Rexam Beverage Can Co.*, 630 F. App'x 461, 463 (6th Cir. 2015). The Age Discrimination in Employment Act of 1967 ("ADEA") prohibits employers from making adverse employment decisions because of an employee's age. 29 U.S.C. § 623(a). Age discrimination can be proven with direct or circumstantial evidence. *Geiger v. Tower Auto*, 579 F.3d

28

614, 620 (6th Cir. 2009).  Here, the evidence supports proof through circumstantial evidence.

To establish a prima facie case of age discrimination, the ADEA plaintiff "must show that: (1) she was over 40 years old; (2) she suffered an adverse employment action; (3) she was qualified for the position she held; and (4) she was either replaced by a person outside the protected class or treated differently than similarly-situated individuals." *Laws v. HealthSouth N. Ky. Rehab. Hosp. Ltd. P'ship*, 508 F. App'x 404, 410-11 (6th Cir. 2012) (*citing Policastro v. Nw. Airlines, Inc.*, 297 F.3d 535, 538-39 (6th Cir. 2002)).

Over 40 years old: The evidence was clear that Officer McNeal was over 40 years old in June, 2018 – in fact he was 62 years old.  (Depo. McNeal, Doc. 27 at p.12, PageID#605.)

Adverse employment action: The evidence was also clear that he suffered an adverse employment action: his employment was terminated.  (*Id.* at 100-104, PageID#693-697.)

Qualified for the position: McNeal had more than 30 years of experience demonstrating that he was qualified for the position.  (*Id.* at pp. 43-47, PageID#636-640.)  Witnesses and peers, experienced and qualified police officers and supervisors that observed McNeal's performance, testified that McNeal did his job well. (Charron Depo. Vol. I, Doc. 35, p. 33, pps. 193-194, 288 PageID#2082, 2242-2243;

29

Charron Depo. Vol. II., Doc. 36, p. 288, PageID#2360; Ziegler Depo., Doc. 32, p. 163, PageID#1951; Stewart Depo., Doc. 51, p. 25, PageID#3321; Schrand Declaration, Doc. 40, ¶12, PageID#2684.) The third prong is likewise met.

The District Court, as it turns out, did not take issue with the fact that the evidence adduced established these prongs.

Fourth prong: The District Court, however, determined that McNeal failed to establish the fourth prong, because he did not show that he was replaced by someone outside the protected class, though did adduce significant evidence that his termination was pretextual. (Opinion, Doc. 63 at PageID#3889-3895.)

But that analysis ignores the fact that the fourth prong can also be established with evidence that the Plaintiff was "treated differently than similarly-situated individuals." *Laws*, 508 F. App'x 404, 410-11, *Policastro, Inc.*, 297 F.3d 535, 538-39; *Mitchell v. Vanderbilt Univ.*, 389 F.3d 177, 181 (6th Cir. 2004). Again, "the fourth element [of the prima facie case] may be satisfied by showing that persons outside the protected class were retained in the same position or that there was some other evidence indicating that the employer did not treat age neutrally in deciding to dismiss the plaintiff." *Skalka v. Fernald Envtl. Restoration Mgmt. Corp.*, 178 F.3d 414, 421 (6th Cir. 1999).

And the record is replete with evidence that McNeal was not treated equally to others outside the protected class, see discussion, *supra*, at pp. 3-28. (Depo.

30

McNeal, Doc. 27, at 67, 87-89, 93-95, 96-99, PageID#660, 680-682, 686-688, 689-692; Depo. Fritts, Doc. 47, pp. 14-16, 18-19, 22-23, 63-64 PageID#2994-2996, 2998-2999, 3002-3003, 3043-3044; Depo. Roach, Doc. 49, pp. 16-20, 46-48, PageID#3204-3208, 3234-3236; Depo. Stewart, Doc. 51, at pp. 17, 25, 63-64, PageID#3313, 3321, 3359-3360; Depo. Schrand, Doc. 42, at pp. 166-167, 170-171, 177-178, 181, 183-184, 192-194, PageID#2852-2853, 2856-2857, 2863-2864, 2867, 2869-2870, 2878-2880; Depo. Charron, Doc. 36, pp. 285-287, PageID#2357-2359; Charron Dec., Doc. 33, ¶13, PageID#2046.)

And, with such evidence, this Court has held a claim for actionable discrimination is established. *Speed Way Transp., LLC v. City of Gahanna*, 2023 U.S. App. LEXIS 5135 (6th Cir. 2023); *Martin v. Toledo Cardiology Consultants, Inc.*, 548 F.3d 405 (6th Cir. 2008). In *Martin*, as here, other witnesses corroborated the fact that other employees had committed similar "infractions," were not fired, but the older employee was terminated. Id. at 406. There, as here, there were a list of favored employees who were younger and outside the protected class and treated more favorably. *Id.* There, the district court rejected the comparators, but this Court explained that the comparators had to be the same in all *relevant* respects. And the Court explained that "[t]he prima facie showing is not intended to be onerous." *Id.* at 412, *citing Jackson v. Fedex Corp. Servs., Inc.*, 518 F.3d 388, 396 (6th Cir. 2008).

31

Here, numerous officers testified to comparable incidents and infractions by younger officers that were not disciplined. Of course, the district court never even reached the comparator analysis, because it wrongly focused on whether someone had replaced McNeal, rather than whether others who were similarly situated had not been disciplined for similar offenses, while McNeal was. That was error. And the district court's judgment should be reversed.

Because we anticipate Defendants to argue that they had a legitimate reason for the termination of the Plaintiff, we return to the fact that such justifications are pretextual. If an employer attempts to offer legitimate reasons for the termination, a plaintiff can establish that these reasons are pretextual by proving that the proffered reasons (1) had no basis in fact; (2) did not actually motivate the adverse employment decision; or (3) were insufficient to motivate discharge. *Chattman v. Toho Tenax Am., Inc.,* 686 F.3d 339, 349 (6th Cir. 2012), construing *Manzer v. Diamond Shamrock Chemicals Co.*, 29 F.3d 1078, 1084 (6th Cir.1994) (overruled on other grounds, *Geiger v. Tower Automotive*, 579 F.3d 614 (6th Cir.2009). The first category requires evidence that the proffered bases for the plaintiff's discharge never happened; the second requires the plaintiff admit the factual basis underlying the employer's proffered explanation and further admit that such conduct could motivate dismissal. *Chattman* at 349, citing *Manzer* at 1084.

McNeal has demonstrated both of these categories. Through the testimony of both current and prior officers and supervisors, he has established that the discipline imposed—termination—was excessively harsh and the result of targeted discipline, and therefore pretextual. In other words, McNeal has offered sufficient facts to conclude that Blue Ash was motivated to terminate him not for the cited violations in the internal report, but because he was an older officer. Officer after officer testified that this discipline was too harsh and motivated by an animus toward older officers. Thus, Blue Ash's proffered reasons for his termination—violations of policy combined with progressive discipline—had no basis in fact because the Department singled him out for higher scrutiny due to his age. The command staff scrutinized McNeal's activity to find minor policy violations which were not enforced on other officers either at all or as harshly; thus, the command staff's discipline was not based on furthering the department policies but rather on illegally targeting McNeal. All the minor infractions either resulted in much lesser discipline on other officers or were contra the unwritten rules and general policy of the Department, such as using discretion to engage lights and sirens behind a squad run.

The third way to establish a pretextual termination is to offer evidence that other employees, particularly employees outside the protected class, were not disciplined even though they engaged in substantially identical conduct to that which the employer contends motivated its discipline of the plaintiff. *Chattman v. Toho*

*Tenax America, Inc.,* 686 F.3d 339, 349, (6th Cir. 2012), citing *Manzer v. Diamond Shamrock Chemicals. Co*., 29 F.3d 1078, 1084 (6th Cir.1994). The third type of pretext is a direct attack on the credibility of the employer's proffered motivation for disciplining the plaintiff. If the plaintiff demonstrates this, then the factfinder can infer illegal discrimination. "In other words, it creates a genuine, triable issue of material fact." Id.; *Flones v. Beaumont Health System*, 567 Fed.Appx. 399, 406 (6th Cir.2014).

McNeal has offered more than sufficient evidence of examples of other officers, including younger officers, who were not disciplined for the same conduct for which the Department repeatedly and progressively disciplined him. In addition to their general observations of heightened scrutiny and increased discipline for older officers, Blue Ash officers described numerous examples of this. (Doc. 35, Charron Depo. Vol. I, pps. 34; 118-119, PageID#2083, 2167-2168; Doc. 51, Stewart Depo., p. 73, PageID#3369; Doc. 51, Stewart Depo., p. 75-76, PageID#3371-3371; Doc. 35, Charron Depo. Vol. I, pps. 33, 167, PageID#2082, 2216; Doc. 27, McNeal Depo., p. 225, PageID#818; Doc. 54, Roach Depo., Volume II, p. 173, PageID#3643.)

Despite the clear evidence of pretextual reasons for McNeal's termination, Defendants invoked the "honest belief" rule, which essentially allows the court to consider an employer's proffered reason as honest when the employer can establish

that it reasonably relied on particularized facts that were before it when the decision is made. *Seeger v. Cincinnati Bell Tel. Co., LLC,* 681 F.3d 274, 285 (6th Cir. 2012), quoting *Joostberns v. United Parcel Servs., Inc.*, 166 F.Appx. 783, 791 (6th Cir. 2006). This analysis is applied when the plaintiff attacks the credibility of the employer's proffered reason and demonstrates that the employer did not actually have cause to take the adverse action based on the proffered reason. If the employer can demonstrate "an honest belief in its proffered reason…. the inference of pretext is not warranted…..an employer's proffered reason is considered honestly held where the employer can establish it reasonably relied on particularized facts that were before it at the time the decision was made." *Seeger* at 285.

However, the "honest belief" doctrine does not apply here. McNeal has demonstrated with sufficient factual basis that Blue Ash did not honestly rely on the proffered reasons for terminating him. Numerous current and former officers testified that the discipline involved was inappropriate for the infractions; they further portray a pattern of targeted scrutiny and excessive discipline applied to older officers at Blue Ash which is not enforced against younger officers. (Doc. 35, Charron Depo. Vol. I, pps. 34; 118-119, PageID# 2083, 2167-2168; Doc. 51, Stewart Depo., p. 73, PageID#3369; Doc. 51, Stewart Depo., p. 75-76, PageID#3371-3371; Doc. 35, Charron Depo. Vol. I, pps. 33, 167, PageID#2082, 2216; Doc. 27, McNeal Depo., p. 225, PageID#818; Doc. 54, Roach Depo., Volume II, p. 173,

PageID#3643.) McNeal has raised sufficient factual issues – more than bare assertions—that Blue Ash's reasons for discipline were pretextual; they were the result of a targeted scrutiny and a disguised effort to force McNeal, the oldest patrolman in the Department, out of his job.  Further, given Noel's dishonest statements in his own Motion for Summary Judgment, in falsely suggesting that McNeal could be responsible for the death of the non-breather, in an attempt to influence the outcome of lawsuit, he should enjoy no presumption of honest belief.

Defendants further insisted that the arbitrator's decision upholding the termination is "highly probative" of the absence of discriminatory intent. But this Court has rejected the principal that an arbitration decision is determinative of a plaintiff's discrimination claims; as such holding would limit "the plaintiff's opportunity to vindicate his statutory and constitutional rights." *Becton v. Detroit Terminal of Consol. Freightways*, 687 F.2d 140, 142 (6th Cir. 1982); see also *Hance v. Norfolk S. Ry.*, 571 F.3d 511, 519 (6th Cir.2009). Rather, a court can defer to the arbitrator's construction of the contract. *Becton*, 687 F.2d at 142.  Defendants failed to articulate any specific findings by the arbitrator that demonstrate an absence of age-based discrimination.  Accordingly, the arbitration decision is not even persuasive authority in this case.

II.    **Plaintiff adduced enough proof to survive summary judgment on his hostile work environment age discrimination claim**

McNeal was also entitled to proceed on his claims for hostile work environment. A hostile work environment requires the existence of severe or pervasive and unwelcome verbal or physical harassment because of a plaintiff's membership in a protected class. *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 66-67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). Title VII of the Civil Rights Act makes it illegal for an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). The ADEA forbids the identical conduct when the discrimination is "because of such individual's age." 29 U.S.C. § 623(a)(1). To demonstrate a hostile work environment claim under the ADEA, a plaintiff must demonstrate that:

- he is older than 40 years;

- he was subjected to harassment, either through words or actions, based on age;

- 'the harassment had the effect of unreasonably interfering with the employee's work performance and creating an objectively intimidating, hostile, or offensive work environment'; and

- there is some basis for holding the employer liable.

*Snyder v. Pierre's French Ice Cream Co*., 589 Fed. Appx. 767 (6th Cir. 2014). *citing Crawford v. Medina Gen. Hosp*., 96 F.3d 830, 834–35 (6th Cir. 1996).

37

In terms of analyzing the third factor, the conduct must be "severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive and the victim must subjectively regard that environment as abusive." *Warf v. U.S. Dept. of Veterans Affairs*, 713 F.3d 874, 878 (6th Cir. 2013), *quoting Bowman v. Shawnee State Univ.*, 220 F.3d 456, 463 (6th Cir. 2000). In determining whether a work environment is objectively hostile or abusive, courts consider the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787-88 (1998) (*quoting Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 23 (1993)). Courts must determine whether the workplace is "so permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Grace v. USCAR*, 521 F.3d 655, 679 (6th Cir.2008)(*quoting Harris*, 510 U.S. at 23).

"Workplace conduct is not measured in isolation." *Clark Cty. School Dist. v. Breeden*, 532 U.S. 268, 270 (2001). So "[w]hen the workplace is permeated with 'discriminatory intimidation, ridicule, and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,' Title VII is violated." *Harris*, 510 U.S. at 21. In determining

whether an actionable hostile work environment claim exists, the court looks to all the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* at 23.

In *White v. Burlington Northern & Santa Fe Ry*., 364 F.3d 789, 803-804 (6th Cir. 2004), this Court determined that adverse employment action existed where the discriminated individuals were assigned to "more arduous" and "dirtier" jobs. See *also Abeita v. Transam. Mailings, Inc.*, 159 F.3d 246, 250-252 (6th Cir. 1998) (continual comments or harassing acts like to be pervasive, establishing hostile work environment); *Paasewe v. Action Group, Inc.,* 530 Fed. Appx. 412, 416 (6th Cir. 2013) (unresponsiveness to complaints, and repeated acts that demonstrate racial animus in the workplace sufficient for hostile work environment claim).

Further, courts have determined that employers exercising a "double standard," whereby discipline is used to harass and damage a particular group while sweeping similar acts of other employees under the rug creates a hostile work environment. *Levitin v. Northwest Community Hosp*., 64 F.Supp.3d 1107, 1125, (N.D. Ill. 2014); *Crawford v. Newport News Indus*. Corp., 2018 WL 4561671, *13 (E.D. Va.), report and recommendation adopted in part, 2018 WL 2943445 (black plaintiffs demonstrated factual issues of hostile environment when they presented

evidence that certain supervisors applied double standards regarding expectation of worker performance, worker standards and worker supervisions; black workers complained of white supervisors micro-managing their work, looking over their shoulders, regularly challenging them when they did not do the same to white workers; black workers complained of being followed, monitored and timed on bathroom and other breaks, while their white counterparts were ignored).

The record before this Court establishes this same type of hostile, pervasive double standard; numerous officers and supervisors repeatedly testified as to the pattern of harsher discipline against McNeal and older officers, including excessive discipline for minor policy violations which Blue Ash did not exercise against other officers. (Dec. Officer Jim Kelley, Doc. 43, PageID#2972; Dec. Mark Ziegler, Doc. 30, PageID#1784; Depo. Mark Zeigler, Doc. 32, PageID#1871-1876; Dec. Connolly, Doc. 44, PageID# 1784; Dec. Riley, Doc. 45, PageID# 1784; Dec. Charron, Doc. 33, PageID#2045; Depo. Ziegler, Doc. 32, PageID#1890; Depo. Schrand, Doc. 42, PageID#2729-2733[9]; Depo. Frits, Doc. 47, PageID#3027-3029; Dec. Charron, Doc. 35, PageID#2216; Stewart Depo., Doc. 51, PageID#3421-3425.)

Further, McNeal was subjected to an adverse job assignments, which is further evidence of a hostile environment. (Doc. 42, Schrand Depo., p. 194, PageID#2880;

---

[9] Officer Schrand's testimony was that even the Chief has made emergency runs without lights and sirens without consequence. *Id.*

Doc. 36, Charron Depo. Vol. II, p. 287, PageID#2359; Doc. 27, Depo. McNeal, at 74, 215-217, 252-258, PageID#667, 808-810, 845-851).  McNeal has offered more than enough evidence to raise issues of facts regarding the severe and pervasive double standard to which he was subjected during the 2 years preceding his termination.

Defendants denied the existence of a hostile work environment, insisting that the concentrated pattern of excessive discipline and unfair and demeaning job assignments directed toward older officers, including McNeal, was nothing more than the "ordinary tribulations of the workplace," such that a reasonable person would not find such conduct to be hostile or abusive.  But while Defendants speculate about the standards of a "reasonable person," this Court should focus on the actual observations in this record of the numerous current and retired officers and supervisors from the same department.  These officers testified repeatedly that McNeal was subjected to a level of scrutiny that would be "difficult to survive" and was given tasks and scrutiny that were destined to fail.  *Id.*

Given the breadth of evidence demonstrating a hostile and pervasive workplace, subjecting older employees to a double standard of work performance and discipline, summary judgment was improper.

### III.    Plaintiff adduced enough proof to survive summary judgment on his state law discrimination claim

Blue Ash argued McNeal's state law age discrimination claim is subject to a 180-day statute of limitations under the prior version of R.C. 4112.02(N). The evidence indicates that Mr. McNeal filed EEOC charges within the six-month period of his discharge. (Sec. Am. Compl., Doc. 12, PageID#155). But, because we deal here with a discharge, the six-year statute of limitations applies. *Taglione v. Charter Communs., LLC*, 842 Fed. Appx. 988 (6th Cir. 2021); *O'Donnell v. Univ. Hosps. Cleveland Med. Ctr.*, 833 Fed. Appx. 605 (6th Cir. 2020); R.C. 4112.14. R.C. 4112.14(B) provides for a remedy against an employer that is identical to the federal remedy. *Ercegovich*, 154 F.3d 344, 357. Thus, because McNeal's federal claims were improperly dismissed, so were his state law claims. *Id.*

### a. <u>Sufficient evidence was adduced to establish claims against the individual Defendants Noel and Waltz to survive summary judgment</u>

Defendants Noel and Waltz are not entitled to immunity under Ohio law. The record demonstrates that Chief Noel acted with malicious purpose and in bad faith when he favored younger officers and unlawfully discriminated against McNeal. He is therefore excluded from immunity under R.C. 2744.03(A)(6). Further, they can both be held liable under the plain language of R.C. 4112.02(J), because they aided, abetted, compelled, and coerced the discharge of the Plaintiff, and the evidence indicates that both were involved in making that decision. And Ohio Courts have imposed such

liability on such employees. *Johnson-Newberry v. Cuyahoga Cty.,* 2019-Ohio-3655 (8th Dist. 2019); *Townsend v. City of Kettering*, 2022-Ohio-2710 (2nd Dist. 2022) Thus, the claims against them were equally improperly dismissed. *Linkletter v. W. & S. Fin. Grp., Inc.*, 851 F.3d 632, 640-641 (6th Cir. 2017); *see, also, Argyriou v. David A. Flynn, Inc.*, 2021 U.S. Dist. LEXIS 36454 (N.D. Ohio Feb. 26, 2021); *Hensley v. Twp.*, 2022 U.S. Dist. LEXIS 180370 (S.D. Ohio 2022).

## CONCLUSION

The District Court erred in granting Defendants' Motions for Summary Judgment, and its judgment should be reversed.

Respectfully submitted,

/s/Zach Gottesman_____
Zach Gottesman (KBA 86288)
404 East 12 St., First Floor
Cincinnati, OH 45202
zg@zgottesmanlaw.com
(513) 225-8997

/s/ Christopher Wiest_____
Christopher Wiest (KBA 90725)
Chris Wiest, Atty at Law, PLLC
25 Town Center Blvd, Suite 104
Crestview Hills, KY 41017
513/257-1895 (c)
chris@cwiestlaw.com

*Attorneys for Plaintiff/Appellant*

## CERTIFICATE OF SERVICE

I certify that I have served a copy of the foregoing upon Counsel for the Defendants/Appellees, this 31st day of May, 2023, by filing same with the Court via its CM/ECF system, and by electronic mail upon Counsel for the Defendants/Appellees, which will provide notice to all parties Counsel.

/s/ Christopher Wiest_____

## CERTIFICATE OF COMPLIANCE

As required by Fed. R. App. P. 32(g) and 6th Cir. R. 32(a), I certify that this Appellants' Brief contains 9,077 words. This response complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in 14-point Times New Roman font using Microsoft Word.

/s/ Christopher Wiest_____

# APPENDIX -- DESIGNATION OF THE DISTRICT COURT RECORD

Plaintiffs/Appellees, pursuant to Sixth Circuit Rule 30(g), designate the

following filings from the district court's electronic record:

| Document ID | Date | Description | Page ID |
|---|---|---|---|
| 12 | 6/6/2020 | Second Amended Complaint | 146-212 |
| 27 | 6/18/2021 | Deposition of Gary McNeal | 1000-1045 |
| 28 | 6/18/2021 | Def. Motion for Summary Judgment | 1075-1094 |
| 29 | 6/21/2021 | Def. Motion for Summary Judgment | 1116-1781 |
| 30 | 7/5/2021 | Declaration of Mark Ziegler | 1784-1787 |
| 32 | 7/5/2021 | Deposition of Mark Zeigler | 1789-2044 |
| 33 | 7/6/2021 | Declaration of Ed Charron | 2045-2048 |
| 35 | 7/6/2021 | Deposition of Ed Charron (Vol.I) | 2050-2309 |
| 36 | 7/6/2021 | Deposition of Ed Charron (Vol.II) | 2310-2405 |
| 37 | 7/6/2021 | Declaration of Chris Zielinski | 2406-2407 |
| 39 | 7/6/2021 | Deposition of Chris Zielinski | 2409-2682 |
| 40 | 7/6/2021 | Declaration of Ken Schrand | 2683-2685 |
| 42 | 7/6/2021 | Deposition of Ken Schrand | 2687-2971 |
| 43 | 7/6/2021 | Declaration of Jim Kelley | 2972-2974 |
| 44 | 7/6/2021 | Declaration of John Connolly | 2975-2977 |
| 45 | 7/6/2021 | Declaration of Rich Riley | 2978-2979 |
| 47 | 7/7/2021 | Deposition of William Fritts | 2981-3187 |
| 49 | 7/7/2021 | Deposition of Beth Roach (Vol.I) | 3189-3295 |
| 51 | 7/7/2021 | Deposition of Todd Stewart | 3297-3556 |
| 54 | 7/11/2021 | Deposition of Beth Roach (Vol.II) | 3560-3765 |
| 55 | 7/19/2021 | Response in Opposition to Summary Judgment | 3766-3803 |
| 63 | 2/23/2023 | Order granting Summary Judgment | 3875-3895 |
| 64 | 2/23/2023 | Clerk's Judgment | 3896 |
| 65 | 3/2/2023 | Notice of Appeal | 3897 |